1
2
3
4
5
6
7
8
9
10
11
12
13

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| DIANA CUERVO, | No. |
| Plaintiff, | COMPLAINT FOR DAMAGES |
| v. | JURY DEMAND |
| AMAZON.COM, INC., AMAZON.COM, SERVICES LLC, and CHRISTOPHER STOIA , in his individual and professional capacities, | |
| Defendants. | |

14  Plaintiff Diana Cuervo ("Plaintiff" or "Ms. Cuervo"), by and through her undersigned

15 counsel, Wigdor LLP, as and for the Complaint in this action against Defendants Amazon.com,

16 Inc., Amazon.com Services LLC (together "Amazon" or the "Company"), and Christopher

17 Stoia ("Stoia") (collectively, "Defendants") hereby states and alleges as follows:

18  **PRELIMINARY STATEMENT**

19  1.  In August 2020, Diana Cuervo, a Latinx woman born in Colombia, accepted a

20 job as an Area Manager of Delivery Operations with Amazon.  To begin work in the job, Ms.

21 Cuervo moved all the way across the country from Brooklyn, New York to Everett,

22 Washington.

23
24
25

COMPLAINT – 1

2.      From the very beginning of her employment, Ms. Cuervo was subjected to shocking and openly racial and ethnic harassment and discrimination by her supervisor, Christopher Stoia.

3.      Stoia relentlessly questioned Ms. Cuervo about her qualifications for her job, making clear that he did not believe a Latina woman could hold her position.  Stoia displayed a clear feeling of untouchability and contempt for his subordinates who were persons of color.

4.      Stoia also made frequent, near daily comments about Ms. Cuervo's accent and Latina heritage, including: **"Latins suck," "How is a Latin like you working here?"** and **"You are a Latina woman, I need to be careful every time I talk to you."**

5.      Stoia also repeatedly asked Ms. Cuervo whether she was concerned about being fired and told her that it would be pointless for her to complain to Human Resources ("HR") about him because, **"HR doesn't work for you, it works for me and for Amazon."**  Stoia also warned her not to complain because Amazon does not like it when employees file complaints and told her that she would be fired if she did complain.

6.      Ms. Cuervo would not simply accept these conditions for herself or her coworkers.  Unfortunately, Stoia's comments about HR turned out to be correct, as nothing was done to curb his abuse and harassment even after Ms. Cuervo made two separate complaints to HR in early 2021.

7.      Likewise, when Ms. Cuervo complained to Stoia in or around mid-February 2021 about a gas leak in the building, Stoia warned her not to tell anyone else about it because, "It will make me look bad."  After the leak still was not repaired, Ms. Cuervo escalated it to higher management at the Company.  Once again, she would not allow threats intimidate her

COMPLAINT – 2

into silence, especially when the safety of all her coworkers (and, incidentally, the Company's best interests) demanded that she do so.

8.      Ultimately, as Stoia said would happen, Ms. Cuervo was terminated just weeks after her multiple HR complaints and the very next day after she escalated her complaints about the gas leak.   She was fired without notice or an explanation as to why she was being terminated.

9.      Callously, and putting even more pressure on her already difficult situation, Amazon soon demanded the return of a signing bonus and approximately $20,000 in relocation expenses that she had incurred and for which she had been reimbursed.   Amazon was already aware that she was seeking legal counsel at the time they made these demands to Ms. Cuervo.

10.      Amazon has an opportunity to sincerely examine its policies and practices and enact meaningful change, as Institutional Shareholder Services, a proxy firm, is recommending that Amazon investors vote in favor of an independent racial audit.   The vote is set for May 26, 2021 at the Company's annual shareholder meeting.   Amazon, however, is asking shareholders to reject the audit.   See https://www.seattletimes.com/business/amazon-investors-urged-by-proxy-firm-to-vote-in-favor-of-racial-audit/ (last accessed May 18, 2021).

11.      Defendants' conduct violated Section 1981 of the Civil Rights Act of 1866, 42. U.S.C. § 1981 ("Section 1981"), the Washington Law Against Discrimination, Wash. Rev. Code § 49.60.010, *et seq.* ("WLAD"), and Washington Common Law.[1]

---

[1] This case, filed by Diana Cuervo, is being filed simultaneously with the cases of other female employees similarly subjected to unlawful discrimination, bias and retaliation at Amazon: Tiffany Gordwin v. Amazon, et al. (U.S. District Court, District of Arizona) (race, gender discrimination and retaliation); Emily Sousa v. Amazon, et al. (U.S. District Court, District of Delaware) (race, national origin, gender discrimination and retaliation); Pearl Thomas v. Amazon, et al. (U.S. District Court, Western District of Washington) (race, gender discrimination and retaliation); and Cindy Warner v. Amazon, et al. (U.S. District Court, Central District of California) (gender discrimination and retaliation).

COMPLAINT – 3

**ADMINISTRATIVE PREREQUISITES**

12.     Ms. Cuervo will file a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII").

13.     Upon the EEOC's completion of its investigation into Ms. Cuervo's charge of discrimination, and/or its issuance of a Notice of Right to Sue, Plaintiff will seek leave to amend this Complaint to add Title VII claims against Amazon.

14.     Any and all other prerequisites to the filing of this suit have been met.

**JURISDICTION AND VENUE**

15.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343, as this action involves federal questions regarding the deprivation of Plaintiff's rights under Section 1981.  The Court has supplemental jurisdiction over Plaintiff's related claims arising under state and/or local law pursuant to 28 U.S.C. § 1367(a).

16.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) as a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

**PARTIES**

17.     Plaintiff Diana Cuervo is a resident of the State of Washington and a former employee of Amazon.  At all relevant times, Ms. Cuervo met the definition of an "employee" under all applicable statutes.

18.     Defendant Amazon.com, Inc. is a Delaware-registered domestic corporation with operations in the State of Washington.  At all relevant times, Defendant Amazon.com, Inc. met the definition of "employer" under all applicable statutes.

WIGDOR LLP
85 Fifth Avenue ● New York, NY
Phone (212) 257-6800 ● Fax (212) 257-6845

19.     Defendant Amazon.com Services LLC is a Delaware-registered domestic corporation with operations in the State of Washington.  At all relevant times, Defendant Amazon.com Services, LLC met the definition of "employer" under all applicable statutes.

20.     Defendant Christopher Stoia is, upon information and belief, a resident of Washington and currently works for Amazon, where he supervised Ms. Cuervo during her employment at the Company and controlled the terms and conditions of her employment.  At all relevant times, Stoia met the definition of "employer" under all applicable statutes.

## FACTUAL ALLEGATIONS

## I.    MS. CUERVO'S BACKGROUND AND HER POSITION AT AMAZON

21.     Ms. Cuervo was born in Medellin, Colombia and immigrated to the United States in 2010.  Her first language is Spanish, and she speaks English with an accent that some may consider recognizably "Latin."

22.     Ms. Cuervo graduated from Colorado State University in May 2018 with a Bachelor of Applied Science in Product Development and a minor in Business Administration.

23.     Before she went to work at Amazon, Ms. Cuervo had a job with Coca-Cola in Brooklyn, New York.

24.     Ms. Cuervo began working at Amazon on or around August 3, 2020, just one day after moving across the country from Brooklyn, New York to Everett, Washington for the job.

25.     Her position was Area Manager, Delivery Operations, and her starting salary was $75,000.00 per year.  She also received a sign-on bonus of $20,000.00 and would have received an additional sign-on bonus of $18,000.00 after the one-year anniversary of her start date.

COMPLAINT – 5

26.     Amazon's offer letter stated that if Ms. Cuervo's employment lasted less than one year, the unearned amount of the first sign-on bonus was required to be paid back to the Company.

27.     Her compensation also included 16 shares of Amazon.com common stock, subject to a vesting schedule set forth in her offer letter.

28.     Ms. Cuervo also was provided with relocation benefits that were to be repaid if her employment lasted less than two years, which is a lengthy tenure for many jobs at Amazon.

29.     Ms. Cuervo was hired as a Level 5 manager despite her degree in Product Development.

30.     She quickly realized that there were a significant number of white men in Level 6 management positions and above without college degrees or work experience that would justify their placement at such high levels.

II.     **MS. CUERVO'S SUPERVISOR MADE RACIST STATEMENTS ABOUT HIS LATINX EMPLOYEES AND SUBJECTED MS. CUERVO TO DISCRIMINATION AND HARASSMENT FROM THE VERY BEGINNING OF HER EMPLOYMENT**

31.     Very soon after she started work with Amazon, Ms. Cuervo learned that her direct supervisor, Delivery Station Operations Manager Christopher Stoia, held his Latinx subordinates in contempt.

32.     Stoia, a white man, immediately made statements to and around Ms. Cuervo that unmistakably showed his disdain for Latinx employees.

33.     Amazon hired Stoia for its DSE4 facility, and Ms. Cuervo was hired for the first Amazon Robotics station in the DWS5 facility.  They were hired around the same time and were in training together.

WIGDOR LLP
85 Fifth Avenue ● New York, NY
Phone (212) 257-6800 ● Fax (212) 257-6845

34.     Although he was hired for a different facility, Stoia made it his mission during training to be transferred to DWS5, where Ms. Cuervo had been hired.  Indeed, Stoia specifically told Ms. Cuervo during training that he would be her manager because he was more intelligent than she was.

35.     During the training, Stoia left the station many times without completing the training and spent more time trying to move to DWS5 than complete the training.

36.     During their Robotics training, Stoia asked Ms. Cuervo questions about her qualifications for the job in a skeptical, probing manner.

37.     Specifically, Stoia asked Ms. Cuervo what she did to get her job, who she knew at Amazon, and whether she had a relationship with anyone at Amazon, conspicuously implying that Ms. Cuervo, as a Latina woman could only have secured a job at Amazon by knowing someone in the Company and not based on her own merit.

38.     In order to collect more ammunition and subjects on which to grill Ms. Cuervo, Stoia would look at her LinkedIn profile.

39.     Stoia's harassment was so intense, hostile and unsettling that Ms. Cuervo deleted her LinkedIn profile to prevent him from obtaining any more details about her education, references, and experience.

40.     This pattern of discrimination and harassment based on Ms. Cuervo's race, ethnicity, national origin, and gender continued throughout her entire employment.

41.     In addition to frequently disparaging Ms. Cuervo's **"Latin accent,"** Stoia's remarks to Ms. Cuervo included (but certainly were not limited to):

- **"How is a Latin like you working here?"**

- **"Latin people suck."**

COMPLAINT – 7

WIGDOR LLP
85 Fifth Avenue ● New York, NY
Phone (212) 257-6800 ● Fax (212) 257-6845

- **"Do you really have a diploma?"**

- **"Working with Latins sucks."**

- **"You are a Latin woman; I need to be careful every time I talk to you."**

- **"You suck!"**

- **"The only reason you are at DWS5 is that Amazon needs to checkmark the diversity box, and it sucks because being an L5 is a big deal for us but not for people like you."**

- **"How you survived in Brooklyn with all the Black people? I was in Queens before. What is worse to live with, Black or Latin? You were in Brooklyn. You answer the question for me."**

42.     On another occasion, Stoia said to Ms. Cuervo: **"You are never going to succeed in Amazon with your red personality.  Red is for Coca-Cola in Brooklyn, not for us."**  Ms. Cuervo understood Stoia's message loud and clear – as a "fiery" Latinx employee there was no room for her to advance within Amazon.

43.     Such blatantly discriminatory and hateful statements were not so-called "stray remarks," but were a daily occurrence that fundamentally altered the terms and conditions of Ms. Cuervo's employment.  Stoia's blatantly hateful behavior caused Ms. Cuervo to live in constant fear of losing her job due to discrimination.

44.     In fact, on one occasion Stoia outright said, **"Hey Diana, are you afraid of losing your job?"**  Ms. Cuervo said that she was indeed afraid of losing her job because of the way Stoia treated her.  Stoia laughed at this and told her, **"Something is going to happen one of these days."**

COMPLAINT – 8

WIGDOR LLP
85 Fifth Avenue ● New York, NY
Phone (212) 257-6800 ● Fax (212) 257-6845

45.     In another incident, Stoia asked Ms. Cuervo whether she wanted to complain about the way he treats her.  When she replied that she did want to complain, Stoia told her it would not matter if she did because HR would not believe her and would take his side anyway.

46.     Stoia further told Ms. Cuervo that if she ever complained about him the Company would fire her.

47.     Stoia frequently told Ms. Cuervo that, **"HR doesn't work for you, it works for me and for Amazon."**

48.     He further told Ms. Cuervo – correctly, as it turned out – that Amazon does not like employees who complain about discrimination and that she would be fired if she complained.

49.     Stoia also subjected Ms. Cuervo to frequent derogatory remarks about women. He commonly complained about working with women in general, and about working with Ms. Cuervo specifically because she is a woman.

50.     Stoia also warned Ms. Cuervo repeatedly that she should not speak at managers' meetings.  He also frequently commented angrily and bitterly about Ms. Cuervo's tone.

51.     Stoia did not treat his male colleagues and subordinates in the same manner. This sort of conduct is a common way for men to bully, demean and treat women as "less than" as though they do not belong in the workplace, which creates an inequitable work environment.

52.     Stoia's prejudiced tirades against Ms. Cuervo nearly always occurred in rooms without cameras.  He would summon her to talk with him in rooms that he knew lacked cameras so that he could act belligerently toward her and intimidate her without worrying about being seen.

WIGDOR LLP
85 Fifth Avenue ● New York, NY
Phone (212) 257-6800 ● Fax (212) 257-6845

53.     Throughout her employment, Ms. Cuervo was outspoken on issues of diversity and equity in the workplace.

54.     Out of approximately 16 to 19 managers, Ms. Cuervo was the only Latina woman who was a manager at her station and there were no Black managers at her station.

55.     Seeing the lack of diversity (particularly in management) and the way that Amazon allows its managers to treat its female employees and persons of color, Ms. Cuervo raised the idea of creating a diversity and inclusion group.  Stoia responded to her idea with hostility and condescension, telling her, **"I didn't get a fucking job here to do that.  That's stupid."**

56.     Stoia also told her that she was rocking the boat – a not-so-subtle threat to stay in her lane and accept her lower position and the discriminatory treatment to which she and others were subjected.

57.     On several occasions, Ms. Cuervo also asked why there were no Black or Latinx managers other than her at the station.  Her concerns about the lack of manager diversity, however, were always dismissed.

58.     Stoia advised Ms. Cuervo that Level 6 manager Jonathan Torres was in charge of diversity at the station and told Ms. Cuervo to focus on overseeing the Company's safety shoe program.

59.     Stoia further told Ms. Cuervo that she made the Company look bad when she raised issues of diversity and inclusion and that she needed to talk about shoes rather than talk about diversity.

60.     Stoia's flagrant racism was not limited to Hispanic employees.

61.     Ms. Cuervo also witnessed him making derogatory remarks about Black people.

WIGDOR LLP
85 Fifth Avenue ● New York, NY
Phone (212) 257-6800 ● Fax (212) 257-6845

62.    In one particularly offensive incident, Stoia questioned the intelligence of a Black female manager from another station.  Ms. Cuervo bravely defended the manager by pointing out that she held a master's degree.  Stoia responded by telling Ms. Cuervo that because the other manager was Black, she could not be smart.

### III.    MS. CUERVO MAKES LEGALLY PROTECTED COMPLAINTS REGARDING HARASSMENT AND DISCRIMINATION

63.    In early February 2021, just a few weeks before her termination, Ms. Cuervo approached Senior Human Resources Assistant Emma Brown to complain about Stoia's discriminatory and harassing conduct.

64.    A meeting was set up between Ms. Brown, Stoia, and Ms. Cuervo so that they could discuss the discriminatory conduct to which Ms. Cuervo was being subjected.

65.    Rather than giving her an opportunity to speak freely or conduct a thorough and confidential investigation by interviewing witnesses separately, Amazon forced Ms. Cuervo to describe the events and express her concerns about discrimination while her tormentor, Stoia, was in the same room.

66.    Indeed, Stoia insisted on being present for the meeting.  This transparent intimidation tactic obviously should not have been permitted by the Company, as it was undoubtedly intended to intimidate Ms. Cuervo and prevent her from feeling comfortable describing the full scope of illegal, discriminatory behavior and harassment by Stoia.

67.    Despite these terrible and clearly compromised circumstances, Ms. Cuervo forthrightly described comments that Stoia made about her and let them know that she was afraid of him and worried about losing her job because of the way he treated her.

68.    Specifically, Ms. Cuervo told Ms. Brown of HR that she was scared of Stoia and tired of being disrespected by him.

COMPLAINT – 11

69.     Because she was forced to have this meeting in front of her direct supervisor, Ms. Cuervo was not comfortable reporting all the details of his harassment.  Throughout the meeting, Ms. Cuervo said many times in front of both Stoia and Ms. Brown, "I am scared, I am scared to talk."

70.     Ms. Brown said little during the meeting and, inexcusably, nothing was done about Stoia's behavior, which continued unabated.

71.     About one week after that initial meeting, Ms. Cuervo again approached Ms. Brown, this time outside of Stoia's presence, to talk with her about him.  Ms. Cuervo reiterated that nothing had been done and that he continued to discriminate against her.  Ms. Cuervo also told Ms. Brown that even though she spoke with an accent and came from another country, Stoia should not be allowed to disrespect her.

72.     Ms. Brown reacted to Ms. Cuervo's complaints with indifference and claimed that she did not realize Ms. Cuervo was born abroad or that she spoke Spanish.

73.     After this second formal complaint of discrimination to HR came to naught, it was crystal clear to Ms. Cuervo that she would not get any support from Amazon HR, and Ms. Brown's dismissiveness only increased the anxiety she felt about losing her job.

74.     Ms. Brown's indifference was demonstrated by her inaction and lack of follow-up with Ms. Cuervo throughout this time.

75.     Ms. Brown told Ms. Cuervo that she was transferring to an Amazon facility in Las Vegas and would introduce Ms. Cuervo to her replacement.  When Ms. Cuervo followed up about the replacement HR representative, Ms. Brown told her that the new person did not end up taking the job.

WIGDOR LLP
85 Fifth Avenue ● New York, NY
Phone (212) 257-6800 ● Fax (212) 257-6845

76.     Shortly after that, Ms. Brown left for vacation in Hawaii.  When Ms. Brown finally returned from Hawaii, she was not interested in investigating Ms. Cuervo's claims.

77.     Neither Ms. Brown nor anyone else at Amazon took any action regarding Ms. Cuervo's multiple complaints.  No investigation was launched, no disciplinary action was ever taken, and no remedial measures were ever put in place.

78.     Indeed, it was not until February 25, 2021 – the day after Ms. Cuervo's termination – that Ms. Brown finally sent Ms. Cuervo an email to inquire about the harassment and discrimination she faced.

79.     Notably, this happened after Ms. Cuervo had already advised Ms. Brown that she would be hiring a lawyer because of her treatment by the Company.

80.     Of course, by then it was already too late because Stoia had fulfilled his frequent threats to terminate Ms. Cuervo when he got a chance.

**IV.     MS. CUERVO PROVIDES NEEDED MANAGERIAL ASSISTANCE AT THE FACILITY DURING A SNOWSTORM WHILE HER MALE COLLEAGUES STAYED HOME**

81.     On February 14, 2021, Ms. Cuervo was working after a snowstorm that had closed the station the previous day.

82.     She was the only manager in the building when she arrived and was assigned to "disarm" the building.

83.     Senior Manager of Station Operations Austin Bartlett sent Ms. Cuervo an email the previous evening that contained the code to disarm the building alarm.

84.     When she arrived at the facility, she had not yet seen the email from Mr. Bartlett and did not know that the building would still be shut.

WIGDOR LLP
85 Fifth Avenue ● New York, NY
Phone (212) 257-6800 ● Fax (212) 257-6845

85.     She sent a text to Stoia, who explained the situation and asked her to send him a picture of the outside of the building so that he could see how the snow removal had progressed.

86.     Before the start of her shift, Ms. Cuervo received a message from Operations Manager Matthew Lee stating that another facility was sending a trailer "in about 30 minutes or so because they are about to run out of space in their yard."  Executive Assistant Shannon Snyder further advised Ms. Cuervo that the truck could dock in doors 30 through 33.

87.     This type of activity was not a part of Ms. Cuervo's regular job duties, but it quickly became her responsibility because there was no other manager on site to assist (nor were any volunteering to come and do so).

88.     Unsure of how to proceed, Ms. Cuervo sent a message to Mr. Lee stating, "I don't want to bother you, but what exactly do I need to do when the trailer arrives to the station?  I don't want to do something wrong."  Mr. Lee responded, "Just put it on one of those doors that Shannon recommended!  Just make sure there isn't a truck already there."

89.     Because she was not a Level 6 manager, Ms. Cuervo was not authorized to disarm the building.

90.     It took over 30 minutes for access to be granted and the building to be disarmed.

91.     Once in the building, Ms. Cuervo began to work.  She sent a message to Ms. Snyder asking if there was a way to track the incoming truck and telling him, "This is the first time that I am going to receive a truck."

92.     Despite making it clear that this was her first time coordinating receiving a truck at the facility, at no point in any of her conversations with Mr. Lee or Ms. Snyder was Ms. Cuervo ever given any instructions about unhooking or releasing a trailer.

COMPLAINT – 14

WIGDOR LLP
85 Fifth Avenue ● New York, NY
Phone (212) 257-6800 ● Fax (212) 257-6845

93.     At about 7:30 PM, three trailers arrived at the station at the same time.  The doors where Ms. Snyder told Ms. Cuervo to have the trucks park – doors 30 through 33 – were all occupied by other trucks.

94.     Ms. Cuervo looked outside to see which doors were unoccupied and clear of snow.

95.     She was particularly concerned about a potential accident because of the significant snow on the ground and because it was still snowing at the time.

96.     Ms. Cuervo called Mr. Lee for guidance.  Mr. Lee, in turn, called Jonathan Torres.  Mr. Torres then called Ms. Cuervo and gave her instructions by phone.  Ms. Cuervo followed Mr. Torres's instructions.

97.     Once the trucks were parked, two of the drivers were very angry and asked for paperwork and confirmation codes to prove they had arrived at the station.

98.     Because this was not a regular part of Ms. Cuervo's job duties, she was unable to provide the drivers with paperwork or confirmation codes.

99.     Ms. Cuervo was told by the drivers and by Mr. Torres that she needed to unhook the trailers; however, she did not know how to do this and there was no Yard Marshall present. One of the drivers offered to help her do it, and she accepted his help.

100.    Two of the truck drivers left full trailers at the station and departed, taking away empty trailers.

101.    There was no empty trailer for the third driver to take, however, and Ms. Cuervo spoke over the phone with the driver's dispatcher.  The dispatcher convinced the driver that it was acceptable for him to leave that station with a "bobtail," meaning with no trailer.  This was all completed according to Mr. Torres's instructions.

WIGDOR LLP
85 Fifth Avenue ● New York, NY
Phone (212) 257-6800 ● Fax (212) 257-6845

102.    The next day, Yard Marshall Jon Brandt messaged Ms. Cuervo, saying that she should not have let one of the drivers take an empty trailer because he was assigned to a different building.

103.    Ms. Cuervo explained that she was the only manager present at the time and had authorization from a Level 6 manager for the driver to take an empty trailer.

104.    Mr. Brandt replied that although he appreciated her help, "there is a process we have to go through" and "it would have been better to just have the driver leave with nothing." Mr. Bartlett, who was also in this message chain, advised that there was no harm done because the driver was assigned to a station that was co-located.

105.    Later, Stoia appeared overjoyed when talking with Ms. Cuervo.  He told her that she had assigned the trucks incorrectly and repeatedly said, "**You finally did something wrong so that I can fire you.**"

106.    Ms. Cuervo explained to Stoia that she was the only manager present at the station and had stepped up to perform tasks beyond her normal duties and help avoid a dangerous situation and/or tremendous disruption of operations and business.

107.    Stoia told Ms. Cuervo that she somehow should not have helped at all.  He made no effort to disguise his contempt, animus, and belief in his untouchability.

## V.    <u>MS. CUERVO REPORTS A DANGEROUS GAS LEAK</u>

108.    In or around mid-February 2021, Ms. Cuervo became aware of a gas leak in the building.

109.    She promptly notified Stoia, her immediate supervisor, of the leak.

COMPLAINT – 16

110.    Stoia told her, "Don't worry about the leak, we are fixing it. **No one else can know about the leak."** Stoia told her that if she reported the leak to anyone, **"It will make me look bad."**

111.    After several days went by, the gas could still be smelled in the building and the problem had not been resolved. The janitorial staff raised concerns about the leak to Ms. Cuervo. They said they were very worried about the leak and were concerned that the building could explode or catch fire.

112.    Because management continued to fail to resolve the gas leak, Ms. Cuervo escalated her concern about it. She emailed the Station Manager, Safety Manager, and Stoia on February 23, 2021 to advise them of the dangerous situation caused by the gas leak.

113.    She was terminated the very next day.

## VI.    MS. CUERVO IS ILLEGALLY FIRED IN RETALIATION FOR ENGAGING IN LEGALLY PROTECTED ACTIVITY

114.    On February 24, 2021, Amazon, through Stoia and Senior Regional Manager Vidya Sadanandan ("Sadanandan"), notified Ms. Cuervo that her employment was being terminated.

115.    No HR employee was present during nearly the entire meeting, until Ms. Brown entered at the very last minute, and only after Ms. Cuervo requested that HR be present.

116.    Ms. Cuervo was blindsided and devastated by her summary termination, which came without any notice whatsoever. During the meeting, Ms. Cuervo asked several questions, nearly all of which Stoia and Sadanandan either could not or would not answer. For example, Ms. Cuervo asked whether she could be transferred to another department or facility or placed on an improvement plan but was told "No."

WIGDOR LLP
85 Fifth Avenue ● New York, NY
Phone (212) 257-6800 ● Fax (212) 257-6845

117.    Ms. Cuervo was also advised that there was no process by which she could appeal her termination.

118.    Unsatisfied with the answers she was receiving, Ms. Cuervo pressed for information regarding any investigation of the events of February 14, 2021 (the day she was left to manage arriving trucks by herself during a snowstorm) or any explanation of the reason for her termination.

119.    Ms. Cuervo also had questions regarding her benefits, bonus, relocation expenses, and Amazon stock, but was merely told that Amazon would send a letter regarding these items.

120.    Crucially, **Ms. Cuervo was never given any reason for her termination**. During the termination meeting, Ms. Cuervo asked several times why she was being terminated and neither Stoia nor Sadanandan gave any clear reason.  The only thing they would tell Ms. Cuervo was that her termination supposedly and somehow was related to the February 14, 2021 incident.

121.    Later, when Ms. Cuervo applied for unemployment, the Washington State Employment Security Department ("ESD") asked the Company why Ms. Cuervo was terminated.  Amazon replied to ESD only that she was "involuntarily terminated" and did not provide any more specific reason.

122.    Twisting the knife, Amazon sent Ms. Cuervo a letter, dated March 15, 2021, informing her that she owes the Company $20,082.30 for repayment of her relocation expenses and the unaccrued portion of her sign-on bonus.

WIGDOR LLP
85 Fifth Avenue ● New York, NY
Phone (212) 257-6800 ● Fax (212) 257-6845

123.    Insultingly, on the same day the Company sent Ms. Cuervo another notification dated March 15, 2021, which claimed that she was overpaid in her last paycheck by $203.57 and demanded repayment by April 15, 2021.

124.    This is simply insult added to injury and demonstrates the Company's callous, petty, and retaliatory treatment of an employee who moved across the country from a good job, only to find she had landed in an abusive, discriminatory job situation.

125.    Ms. Cuervo's termination came just weeks after she twice complained to Ms. Brown about the discrimination and harassment to which Stoia subjected her.

126.    Likewise, her termination was also just days after she raised the alarm regarding a potentially dangerous gas leak in Amazon's facility and came immediately after she escalated those concerns to higher management and made it clear she was not going to drop it.

127.    Cynically, Amazon's HR person, Ms. Brown, did not make any serious attempt to talk with Ms. Cuervo about her multiple complaints of discrimination and harassment until after Ms. Cuervo was terminated.

128.    Undoubtedly, Amazon was seeking to talk with Ms. Cuervo in its own interests, likely to question her without an attorney in an effort to extract an account from her that might be less damning.  Ms. Cuervo did not take the bait and, based upon the Company's and Stoia's conduct to that point, decided that the only way to ensure that the truth of what happened to her became known was to file that account publicly in court.

## FIRST CAUSE OF ACTION
### (Discrimination and Harassment in Violation of Section 1981)
*Against All Defendants*

129.    Plaintiff hereby repeats, reiterates, and re-alleges each and every allegation in each of the preceding paragraphs, as though fully set forth herein.

WIGDOR LLP
85 Fifth Avenue ● New York, NY
Phone (212) 257-6800 ● Fax (212) 257-6845

130.     Defendants have discriminated against Plaintiff on the basis of her race and ethnicity (Latinx/Hispanic) in violation of Section 1981 by denying her the same terms and conditions of employment available to non-Latinx employees, including, but not limited to, subjecting her to disparate working conditions, denying her terms and conditions of employment equal to that of her co-workers who do not belong to the same protected categories, and denying her the opportunity to work in an employment setting free of unlawful discrimination and harassment.

131.     Defendants have discriminated against Plaintiff on the basis of her race and ethnicity in violation of Section 1981 by fostering, condoning, accepting, ratifying, and/or otherwise failing to prevent or to remedy a hostile work environment that has included, among other things, frequent, severe and pervasive discrimination and harassment.

132.     As a direct and proximate result of Defendants' unlawful discriminatory conduct and harassment in violation of Section 1981, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, including but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, as well as physical injury, for which she is entitled to an award of damages and other relief.

133.     Defendants' unlawful and discriminatory actions constitute malicious, willful, and wanton violations of Section 1981, for which Plaintiff is entitled to an award of punitive damages.

**SECOND CAUSE OF ACTION**
**(Retaliation in Violation of Section 1981)**
***Against All Defendants***

WIGDOR LLP
85 Fifth Avenue ● New York, NY
Phone (212) 257-6800 ● Fax (212) 257-6845

134.    Plaintiff hereby repeats, reiterates, and re-alleges each and every allegation in each of the preceding paragraphs, as though fully set forth herein.

135.    Defendants retaliated against Plaintiff by, *inter alia*, terminating her employment because of her engagement in activities protected under Section 1981.

136.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of Section 1981, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which she is entitled to an award of damages.

137.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of Section 1981, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, including but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, as well as physical injury, for which she is entitled to an award of damages.

138.    Defendants' unlawful and retaliatory actions constitute malicious, willful, and wanton violations of Section 1981, for which Plaintiff is entitled to an award of punitive damages.

## THIRD CAUSE OF ACTION
**(Discrimination and Harassment in Violation of Washington Law Against Discrimination)**
***Against All Defendants***

139.    Plaintiff hereby repeats, reiterates, and re-alleges each and every allegation in each of the preceding paragraphs, as though fully set forth herein.

WIGDOR LLP
85 Fifth Avenue ● New York, NY
Phone (212) 257-6800 ● Fax (212) 257-6845

140.    Defendants have discriminated against Plaintiff on the basis of her race, ethnicity, national origin (Colombia), and sex in violation of the Washington Law Against Discrimination, Wash. Rev. Code §§ 49.60.010, *et seq*., by, *inter alia*, denying her the right to obtain and hold employment without discrimination.

141.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the WLAD, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which she is entitled to an award of damages.

142.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the WLAD, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, including but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, as well as physical injury, for which she is entitled to an award of damages.

**FOURTH CAUSE OF ACTION**
**(Retaliation in Violation of Washington Law Against Discrimination)**
***Against All Defendants***

143.    Plaintiff hereby repeats, reiterates, and re-alleges each and every allegation in each of the preceding paragraphs, as though fully set forth herein.

144.    Defendants retaliated against Plaintiff by, *inter alia*, terminating her employment because of her engagement in activities (e.g., complaining of discrimination) protected under the Washington Law Against Discrimination, Wash. Rev. Code §§ 49.60.010, *et seq*.

145.    As a direct and proximate result of Defendants' unlawful discriminatory retaliation in violation of the WLAD, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which she is entitled to an award of damages.

WIGDOR LLP
85 Fifth Avenue ● New York, NY
Phone (212) 257-6800 ● Fax (212) 257-6845

146.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the WLAD, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, including but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, as well as physical injury, for which she is entitled to an award of damages.

## FIFTH CAUSE OF ACTION
### (Wrongful Termination in Violation of Washington Public Policy)
*Against All Defendants*

147.    Plaintiff hereby repeats, reiterates, and re-alleges each and every allegation in each of the preceding paragraphs, as though fully set forth herein.

148.    Defendant has violated Washington law by, *inter alia*, firing Plaintiff in violation of Washington public policy because she raised the alarm regarding a gas leak in Amazon's facility.

149.    Washington has enacted laws demonstrating clear public policy in favor of workplace safety and establishing minimum standards. See, e.g., Wash. Rev. Code § 70.87.020.

150.    Such laws are designed to discourage the conduct in which Defendants engaged – allowing a dangerous gas leak to persist despite complaints by employees and admonishing employees not to tell anyone about the dangerous situation.

151.    Plaintiff has suffered harm as a direct and proximate result of Defendants' unlawful conduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment in her favor and against Defendants for the following relief:

COMPLAINT – 23

A.      A declaratory judgment that the actions, conduct, and practices of Defendants complained of herein violate the laws of the United States;

B.      An award of damages against Defendants, in an amount to be determined at trial, plus interest, to compensate Plaintiff for all monetary and/or economic damages;

C.      An award of damages against Defendants, in an amount to be determined at trial, plus interest, to compensate for all monetary and/or compensatory damages, including, but not limited to, compensation for Plaintiff's emotional distress and physical injury;

D.      An award of liquidated damages equal to the amount of Plaintiff's past and future lost wages;

E.      An award of punitive damages in an amount to be determined at trial;

F.      Prejudgment interest on all amounts due;

G.      Post-judgment interest as may be allowed by law;

H.      An award of Plaintiff's reasonable attorneys' fees and costs; and

I.      Such other and further relief as the Court may deem just and proper.

COMPLAINT – 24

WIGDOR LLP
85 Fifth Avenue ● New York, NY
Phone (212) 257-6800 ● Fax (212) 257-6845

**JURY DEMAND**

Plaintiff hereby demand a trial by jury on all issues of fact and damages stated herein.

Dated: May 19, 2021

                                        Respectfully submitted,

                                        **WIGDOR LLP**


                                        Lawrence M. Pearson
                                        Jeanne M. Christensen
                                        Alfredo J. Pelicci
                                        Anthony G. Bizien
                                        (all pending *pro hac vice* admission)

                                        85 Fifth Avenue
                                        New York, NY 10003
                                        Telephone: (212) 257-6800
                                        Facsimile: (212) 257-6845
                                        lpearson@wigdorlaw.com
                                        jcrhistensen@wigdorlaw.com
                                        apelicci@wigdorlaw.com
                                        abizien@wigdorlaw.com


                                        SCHROETER GOLDMARK & BENDER


                                        _____
                                        JAMAL N. WHITEHEAD, WSBA #39818
                                        810 Third Avenue, Suite 500
                                        Seattle, WA  98104
                                        Phone: (206) 622-8000
                                        Fax: (206) 682-2305
                                        whitehead@sgb-law.com

                                        *Counsel for Plaintiff*

COMPLAINT – 25